*1541*

**FILED**

DEC 22 2017

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>ex rel</u>. [UNDER SEAL], | Case No. 17-1654 |
| Plaintiffs, | COMPLAINT |
| v. | |
| [UNDER SEAL], | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** |
| Defendants. | |

**DOCUMENT TO BE KEPT UNDER SEAL**

1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA <u>ex rel.</u> LOUIS LONGO | Case No. |
| Plaintiff, | COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT |
| vs. | |
| WHEELING HOSPITAL, INC., R&V ASSOCIATES, LTD., and RONALD L. VIOLI, | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** |
| | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

Pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.,* (the "False Claims Act" or the "FCA"), *qui tam* Plaintiff-Relator Louis Longo (hereinafter "Relator"), on behalf of the United States of America for this Complaint against Wheeling Hospital, Inc., R&V Associates, LTD., and Ronald L. Violi ("Defendants"), alleges as follows:

## I.  INTRODUCTION AND OVERVIEW

1.      Through a scheme of improper financial relationships and remuneration, including paying excessive compensation to select physicians with high patient volumes for their referrals, Defendants have defrauded and continue to defraud Medicare and Medicaid out of tens of millions of dollars of federal funds from 2008 to the present.

2.      Defendants strategically entered into certain improper compensation and other arrangements with employed and independently contracted physicians, which exceeded fair market value, were not commercially reasonable, and/or took into account the value or volume of referrals or other business generated, in violation of the Stark Law and/or Anti-Kickback Statute.

2

3.      While the Stark Law and Anti-Kickback Statute contain exceptions and safe
harbors for certain types of financial relationships, they generally require that remuneration
is consistent with fair market value, is not determined in a manner that takes into account
(directly or indirectly) the volume or value of referrals, and/or that arrangements are
commercially reasonable without considering the value of referrals between the parties.

4.      Defendants knowingly ignored these requirements and paid exorbitant
compensation to certain physicians (in some cases over $1M a year) well in excess of the
accepted industry survey/standards for physician compensation.

5.      Defendants knew that the salaries were excessive and that they would lose
money on certain of the physician practices; they consistently tracked the amount of
downstream revenue generated by the physician referrals and specifically determined that
the inflated salaries and significant losses were justified because of the "downstream
revenue" from these lucrative referrals.

6.      Defendants knowingly submitted and/or caused to be submitted false or
fraudulent claims for payment from these physician referrals to Medicare and Medicaid, and
failed to return overpayments received from those referrals, in violation of the False Claims
Act (FCA), 31 U.S.C. 3729, et seq.

7.      Relator seeks, through this action, to recover damages and civil penalties
arising from the false or fraudulent records, statements and/or claims that Defendants
knowingly made or caused to be made in connection with their fraudulent scheme.

## II.    PARTIES

8.      Relator Louis Longo is a resident of the Commonwealth of Pennsylvania.
He was employed as an Executive Vice President at Wheeling Hospital from November
2011 through August 2015.  Through his previous employer, the accounting firm Deloitte,
Relator had also overseen a financial consulting revenue cycle and cost efficiency project at

3

Wheeling Hospital, which commenced in March of 2006.   In 2011, Relator was approached by Ronald Violi ("Violi") the CEO of Wheeling Hospital, and asked to be an executive at Wheeling Hospital with the stated intention that he ultimately succeed him as CEO. Relator's role at Wheeling Hospital was not well defined, and he was assigned projects by Violi that included financial and other revenue based aspects of the hospital's business. Relator has first-hand knowledge of the improper agreements at issue in this Complaint, most of which were first entered into by Wheeling Hospital prior to his employment.

9.      Defendant Wheeling Hospital, Inc., is a non-profit corporation organized under the laws of the State of West Virginia, serving the Northern Panhandle of West Virginia, Eastern Ohio and parts of Pennsylvania and is located at 1 Medical Park in Wheeling, WV.   Belmont Community Hospital, Belmont Health Center, St. Clairsville Health Center, Colerain Health Center and Powhatan Health Center (all located in Ohio) and Wellsburg Clinic (located in Brooke County, WV) are also affiliates of Wheeling Hospital. The hospital was founded in 1850 by Bishop Richard V. Whelan and Dr. Simon Hullihen, and is owned by the Roman Catholic Diocese of Wheeling-Charleston.   Wheeling Hospital bills for, and receives, a substantial amount of its revenue from Medicare and Medicaid, including during the time set forth in the Complaint.

10.      Defendant R&V Associates, Ltd. is a limited liability company organized under the laws of the Commonwealth of Pennsylvania, operating as a business consulting and crisis management company and located at 310 Grant St., Suite 1120, Pittsburgh, PA 15219.   Its two principals are Ronald L. Violi and Vincent C. Deluzio.   R&V Associates was retained by Wheeling Hospital in 2006 to spearhead a financial turnaround.  R&V Associates — through Ronald Violi — was instrumental in the compensation arrangements at issue in this Complaint.  R&V Associates continues to maintain a management and consulting role with Wheeling Hospital.

11.     Defendant Ronald L. Violi is a resident of the Commonwealth of Pennsylvania and is one of the two owners, as well as the Managing Director, of R&V Associates.  Violi was appointed as CEO of Wheeling Hospital starting in 2006, maintaining that position to this day.   He was the driving force behind the compensation agreements at issue in this Complaint.

## III.  JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

13.     Although the issue is no longer jurisdictional, the public disclosure provisions of the federal False Claims Act do not bar this suit.  To the extent there has been a public disclosure of the allegations or transactions alleged in this complaint, Relator is an original source of the information on which this Complaint is based.  He reported the information to the Government before any public disclosure of the allegations or transactions, has information that is independent of the public disclosure and that information materially adds to any information that the Government may have.

14.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendants have minimum contacts with the United States.  Moreover, the Defendants can be found in and/or have transacted business in the Western District of Pennsylvania.

15.     Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because one or more of the Defendants can be found in and/or transact or have transacted business in this district.  At all times relevant to this Complaint, two of the Defendants instrumental in the allegations at

issue were located in this district, as R&V Associates maintains an office in in this district
and Violi's primary residence is in this district.

## IV.   APPLICABLE LAW

### A.   The False Claims Act

16.     The FCA was originally enacted during the Civil War.  Congress
substantially amended the Act in 1986 — and, again, in 2009 and 2010 — to enhance the
ability of the United States to recover losses sustained as a result of fraud against it.  The
Act was amended after Congress found that fraud in federal programs was pervasive and
that the Act, which Congress characterized as the primary tool for combating government
fraud, was in need of modernization.  Congress intended that the amendments would create
incentives for individuals with knowledge of fraud against the Government to disclose the
information without fear of reprisals or government inaction, and to encourage the private
bar to commit legal resources to prosecuting fraud on the government's behalf.

17.     The FCA prohibits knowingly presenting or causing to be presented to the
federal government a false or fraudulent claim for payment or approval and knowingly
making or using, or causing to be made or used, a false or fraudulent record or statement
material to a false or fraudulent claim.  31 U.S.C. § 3729(a)(1)(A)-(B).  Any person who
violates the FCA is liable for a civil penalty for each violation, plus three times the amount
of the damages sustained by the United States.  31 U.S.C. § 3729(a)(1).

18.     For purposes of the FCA, a person "knows" a claim or statement is false if
that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in
deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless
disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1).  The FCA does
not require proof that a defendant specifically intended to commit fraud.  *Id.*

19.     The FCA allows any person having information about an FCA violation to
bring an action on behalf of the United States and to share in any recovery.  Such an action

is known as a *qui tam* action and the individual bringing the suit is a *qui tam* relator.  The

FCA requires that the *qui tam* complaint be filed under seal for a minimum of 60 days

(without service on the defendant during that time) to allow the government time to conduct

its own investigation and to determine whether to join the suit.

**B.**      **Medicare**

20.      Medicare is a federally-funded health insurance program which provides for

certain medical expenses for persons who are over 65, who are disabled, or who suffer from

End Stage Renal Disease.

21.      The Medicare Program has four parts: Part A, Part B, Part C and Part D.

Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital

services and post-hospital nursing facility care.  Medicare Part B, the Voluntary

Supplemental Insurance Plan, covers the cost of services performed by physicians and

certain other health care providers, both inpatient and outpatient, if the services are

medically necessary and directly and personally provided by the provider.  Medicare Part C

covers certain managed care plans, and Medicare Part D provides subsidized prescription

drug coverage for Medicare beneficiaries.

22.      The Medicare program is administered through the Department of Health and

Human Services, Centers for Medicare and Medicaid Services ("CMS").

23.      Medicare coverage is limited to those items and services which are

reasonable and medically necessary.  42 U.S.C. § 1395y(a)(1).  Health care practitioners and

providers are required to ensure that all services are "provided economically and only when,

and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1),(3).  Providers who

furnish services or items substantially in excess of the needs of their patients may be

excluded from participation in federal health care programs altogether.  42 U.S.C. § 1320a-

7(b)(6).

24.     Providers who participate in Medicare Part A must periodically sign an application for participation in the Medicare program.   The application, which must be signed by an authorized representative of the provider, contains a certification statement that states "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law) and on the provider's compliance with all applicable conditions of participation in Medicare."

25.     Under the "traditional" Medicare program (Parts A and B), CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services.

26.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare Part A claims for interim reimbursement for inpatient and outpatient items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64.

27.     In order to bill Part A, hospitals submit patient-specific claims for interim payments on a Form UB-04.

28.     Wheeling Hospital submitted, or caused to be submitted, claims both for specific inpatient and outpatient services provided to individual beneficiaries, and claims for general and administrative costs incurred in treating Medicare beneficiaries.

29.     As a prerequisite to payment under Medicare Part A, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as the hospital cost report. Cost reports are the final claim that a provider submits for items and services rendered to Medicare beneficiaries.

8

30.     After the end of each hospital's fiscal year, the hospital files its hospital cost report, stating the amount of Part A reimbursement the provider believes it is due for the year. See 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. See also 42 C.F.R. § 405.180l(b)(l). Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. See 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(l).

31.     During the relevant time period, Medicare Part A payments for hospital services were determined by the claims submitted by the provider for particular patient discharges during the course of the fiscal year. On the hospital cost report, this Medicare liability for services is then totaled with any other Medicare Part A liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare Part A beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare Part A program or the amount due the provider.

32.     Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

33.     For all relevant years, the responsible provider official was required to certify, in pertinent part:

> to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.
> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

34.     For the entire period at issue, the hospital cost report certification page also included the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or

imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

35.     Thus, the provider was required to certify that the filed hospital cost report is (1) truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) correct, *i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, *i.e.*, that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the AKS and Stark laws (described below).

36.     For each of the years at issue, Wheeling Hospital submitted cost reports attesting, among other things, to the certification quoted above.

37.     A hospital is required to disclose all known errors and omissions in its claims for Medicare Part A reimbursement (including its cost reports).

38.     In addition to Part A claims, doctors or other providers submit Medicare Part B claims for payment.

39.     Under Part B, Medicare will generally pay 80 percent of the "reasonable" charge for medically necessary items and services provided to beneficiaries. See 42 U.S.C. §§ 13951(a)(l), 1395y(a)(l). For most services, the reasonable charge has been defined as the lowest of (a) the actual billed charge, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality. See 42 C.F.R. §§ 405.502-504.

40.     Medicare Part B is a voluntary subsidized insurance program covering, *inter alia*, physicians' services, certain outpatient hospital care, and laboratory services.  Part B's benefits are paid from the federal Supplemental Medical Insurance Trust Fund, which is financed by individual premiums and general federal tax revenues.

41.     Medicare Part B pays for "medical and other health care services" provided by a physician, subject to specific exclusions. See 42 C.F.R. § 424.24.

10

42.     In order to bill Medicare Part B, a provider must submit a claim form called the CMS 1500. The provider certifies on the claim form to the truthfulness of the claim and signs a provider agreement agreeing to comply with all Medicare requirements including the fraud and abuse provisions.   A provider who fails to comply with these statutes and regulations, including the Stark Law and Anti-Kickback Statute is not entitled to payment for services rendered to Medicare patients.

### C.     The Medicaid Program

43.     Medicaid is a public-assistance program created in 1965 that provides payment of medical expenses for low-income and disabled patients. Funding for Medicaid is shared between the federal government and those states participating in the program. Medicaid is the largest source of funding for medical services for America's poor and disabled. Each provider that participates in the Medicaid program must sign a provider agreement with his or her state.

44.     Federal regulations require each state to designate a single state agency responsible for the Medicaid program. The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX of the Social Security Act and with the regulations the Secretary of HHS promulgates. Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.  Federal statutes and regulations restrict the items and services for which the federal government will pay through its funding of state Medicaid programs.

45.     The amount of federal financial participation (FFP) (also referred to as Federal Medical Assistance Percentages) in Medicaid spending by each state is calculated each fiscal year in accordance with a formula established under Title XIX, with federal portion ranging from a low of 50% in federal funding to more than 75%, depending on a variety of factors including such things as the relative wealth of the State and its people and the total amount and kinds of expected Medicaid expenditures that are needed or expected.

11

For example, for fiscal year 2012, the FFP for Pennsylvania was 55.07%, the FFP for Ohio was 64.15% and the FFP for West Virginia was 72.62%.

46.   Currently, the agency responsible for the administration of the state Medicaid program in the Commonwealth of Pennsylvania is the Pennsylvania Department of Human Services; in the State of West Virginia is the West Virginia Department of Health and Human Resources; and in the state of Ohio is the Ohio Department of Medicaid.

47.   Each state Medicaid program must cover hospital services, 42 U.S.C. § 1396a(1)(A), 42 U.S.C. § 1396d(A)(1)-(2), and each program uses a cost reporting method similar to that used under Medicare.

48.   Each provider participating in the Medicaid program must sign a Medicaid provider agreement with that state.   Although there are variations in the agreements among the states, all states require the prospective Medicaid provider to agree to comply with all Federal and State Medicaid requirements, including the fraud and abuse provisions and the Stark Law and Anti-Kickback Statute.   A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicaid patients.

**D.**   **Stark Law**

49.   Enacted as amendments to the Social Security Act, 42 U.S.C § 1395nn (commonly known as the "Stark Statute") prohibits a hospital (or other entity providing designated health services) from submitting Medicare claims for designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital, and prohibits Medicare from paying any such claims.

50.   The Stark Statute establishes the clear rule that the United States will not pay for designated health services prescribed by physicians who have improper financial relationships with the billing providers. The statute was designed specifically to prevent

losses that might be suffered by the Medicare program due to questionable utilization of designated health services.

51.     The Stark Statute explicitly states that Medicare may not pay for any designated health service provided in violation of the Stark Statute. See 42 U.S.C. § 1395nn(g)(1). In addition, the regulations implementing the Stark Statute expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R § 411.353.

52.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider unless a statutory or regulatory exception applied. See Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

53.     In 1993, Congress passed Stark II, which extended the Stark Statute to referrals for additional designated health services. See Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

54.     The Stark Statute prohibits a hospital from submitting a claim to Medicare for "designated health services" that were referred to the hospital by a physician with whom the hospital has a "financial relationship," unless a statutory exception applies. "Designated health services" include inpatient and outpatient hospital services and radiology services. See 42 U.S.C. § 1395nn(h)(6).

55.     In pertinent part, the Stark Statute provides:
    (a) Prohibition of certain referrals

    (1)    In general
        Except as provided in subsection (b) of this section, if a physician . . . has a financial relationship with an entity specified in paragraph (2), then -

13

> (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
>
> (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

56. "Financial relationship" includes a "compensation arrangement," which means any arrangement involving any remuneration paid directly or indirectly to a referring physician. See 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

57. The Stark Statute and companion regulations contain exceptions for certain compensation arrangements. These exceptions include, among others, "bona fide employment relationships," "personal services arrangements," "fair market value arrangements," and "indirect compensation relationships."

58. In order to qualify for the Stark Statute's exception for bona fide employment relationships, compensation arrangements must meet, *inter alia*, the following statutory requirements: (A) the amount of the remuneration is fair market value and not based on the value or volume of referrals; and (B) the remuneration would be commercially reasonable even in the absence of referrals from the physician to the hospital. See 42 U.S.C. §§ 1395nn(e)(2)(B) and (e)(2)(C).

59. In order to qualify for the Stark Statute's exception for personal services arrangements, a compensation arrangement must meet, *inter alia*, the following statutory requirements: (A) the compensation does not exceed fair market value; and (B) is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties (unless it falls within a further "physician incentive plan" exception as described in the statute). See 42 U.S.C. § 1395nn(e)(3)(A)(v).

60. A "physician incentive plan" under § 1395nn(e)(3) is defined very narrowly, and only applies to compensation arrangements that "may directly or indirectly have the

14

effect of reducing or limiting services provided with respect to individuals enrolled with the entity." 42 U.S.C. § 1395nn(e)(3)(B)(ii).

61.     In order to qualify for the Stark Statute's exception for fair market value compensation, *inter alia*, all compensation must be set in advance and consistent with fair market value and the agreement must not take into consideration the volume or value of referrals or other business generated by the referring physician. See 42 C.F.R. § 411.357(1).

62.     In order to qualify for the Stark Statute's exception for indirect compensation arrangements, defined roughly as any instance where compensation flows from the entity providing designated health services through an intervening entity and then to the referral source (see 42 C.F.R. § 411.354(c)(2)), *inter alia*, the compensation must be consistent with fair market value, the compensation may not take into consideration the volume or value of referrals or other business generated by the referring physician, and the agreement cannot violate the Anti-Kickback Statute. See 42 C.F.R § 411.357(p).

63.     The Stark Statute also applies to clams for payment made under Medicaid, such that federal funds may not be used to pay for designated health services billed in violation of the Stark Law through a state Medicaid program. See 42 U.S.C. § 1396b(s).

64.     Compliance with the Stark Statute is a prerequisite to payment and reimbursement from Medicare, is at the essence of the bargain and is material to the government's decision to pay.   Defendants certified compliance with the Stark Statute as described above.

E.      **The Anti-Kickback Statute**

65.     The federal health care Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), ("AKS") arose out of Congressional concern that financial inducements can influence health care decisions and result in goods and services being provided to patients even when unnecessary or even harmful.  To protect the integrity of federal health care programs, Congress prohibited the payment of kickbacks in any form, regardless of whether the

kickback actually gives rise to overutilization or unnecessary care. The AKS also reaches kickbacks concealed as legitimate transactions. See Social Security Amendments of 1972, Pub. L. No. 92-603, §§242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare and Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

66.     The AKS prohibits any person or entity from making or accepting payments to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. § 1320a-7b(b).

67.     The AKS has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals.  An opportunity to earn a fee may be sufficient to constitute an inducement, even if payments were reasonable for services.

68.     The Anti-Kickback Statute contains statutory safe harbors that exempt certain transactions from its prohibitions such as contracts for employment or personal services.  The personal services safe harbor applies to payments to an agent as long as: (1) the agency agreement is in writing and signed by the parties; (2) the agreement specifies all of the services that the agent is to provide for the principal; (3) if "the agency agreement is intended to provide the services of the agent on a periodic, sporadic, or part-time basis" then the agreement must specify the intervals and their schedules and charges with specificity; (4) the term of the agreement must be not less than 1 year; (5) the aggregate compensation to the agent must be set in advance, "consistent with fair-market value," and not be determined "in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties;" (6) the services must not involve promotion of any activity that violates state or Federal law; and (7) the aggregate services contracted for must not exceed those reasonably necessary to accomplish the business purpose of the entity.  42 C.F.R. § 1001.952(d).

16

69.     The employment safe harbor applies to all remuneration paid by an employer to a bona fide employee "for employment in the furnishing of any item or service for which payment may be made in whole or in part under" any Federal health care program. 42 C.F.R. §1001.952(i).  This safe harbor provides a defense against Anti-Kickback Statute liability only where a bona fide employee is compensated exclusively for the provision of professional services that are covered by a federal health care program.  Any payments to an employee that are not, in fact, made for the provision of covered professional services do not fall within the safe harbor.

70.     The act of referring a patient to a hospital or other provider is not a "covered item or service."  Therefore, any payments made to an employee to compensate that employee for making referrals are not covered by the employee Anti-Kickback safe harbor.  This is true even if the majority of an employee's compensation is for the provision of legitimate professional covered services.  As to that portion of the payments that is made to induce referrals and to compensate for an employee's act of referring a patient, the Anti-Kickback Statute is violated and the safe harbor does not apply.

71.     Compliance with the AKS is a precondition to both participation as a health care provider in and payment under Medicaid, Medicare and other federal health care programs.  As described above, providers are required to enter into Provider Agreements with CMS that certify they are complying with the Medicare laws, regulations and program instructions, including the AKS.

72.     Similarly, compliance with the AKS is a prerequisite to a provider's right to receive or retain reimbursement payments from government-funded health care programs.

73.     Thus, compliance with these terms is at the essence of the bargain between the government and providers and material to the government's decision to pay.

74.     Any party convicted under the AKS must be excluded from federal health care programs (i.e., not allowed to bill for services rendered) for a term of at least five years.

42 U.S.C. § 1320a-7(a)(1).  Even without a conviction, if the Secretary of the Department of Health and Human Services ("HHS") finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which event the Secretary must direct the relevant State agency to exclude that provider from the State health program), and may consider imposing administrative sanctions of $50,000 per kickback violation.  42 U.S.C. § 1320a-7(b).

75.    The enactment of these various provisions demonstrates Congress' commitment to the fundamental principle that federal health care programs will not tolerate the payment of kickbacks.

76.    Furthermore, pursuant to the Affordable Care Act passed in 2010, any claim submitted to a federal health care program that includes items or services resulting from violations of the AKS constitutes a false or fraudulent claim for purposes of the False Claims Act.  42 U.S.C. § 1320a-7b(g).

## V.    **BACKGROUND**

77.    Wheeling Hospital is a 247 bed, non-profit, acute care hospital located in Wheeling, WV. Wheeling Hospital serves the Northern Panhandle of West Virginia, Eastern Ohio and parts of Pennsylvania.

78.     The hospital has several subsidiaries. The hospital also has a Physician Practice Division (PPD) that employs various primary care and specialty physicians.

79.    In the early 2000s Wheeling Hospital was experiencing severe financial difficulties, having lost more than $50 million from operations in the seven years preceding the arrangement with R&V Associates and Violi (between 1998-2005).

80.    In late 2005, it entered into a management contract with R&V Associates, a business consulting and crisis management company located in Pittsburgh, PA, to assist in the hospital's financial analysis and hopeful turnaround.

81.     This effort was led by Violi — an owner and principal of R&V Associates —
who was retained by the hospital as the new CEO starting in January 2006.

82.     Wheeling Hospital has paid R&V Associates and Violi approximately $3M
per year, totaling more than $26M from 2008 through the present for such consulting
services.

83.     This change in management successfully reduced its significant losses and
steadily turned the hospital into an extremely profitable venture.  However, several of the
arrangements that drove this newfound excessive profitability were illegal.

84.     In FY 2005, the year before Violi's & R&V Associates' involvement,
Wheeling Hospital lost approximately $6.5M.   That was the last the year that the hospital
lost money.

85.     By FY 2016, Wheeling Hospital earned an annual profit of $35.8M and a
cumulative profit of over $100M in the past three fiscal years—2014, 2015 and 2016.

86.     Violi, through his control over Wheeling Hospital's executive management,
authorized or expanded contractual arrangements with physicians to drive a dramatic
increase in the hospital's market share, revenue and profitability.

87.     While certain targeted expense management and revenue collection efforts
were put in place, the critical component to the hospital's growing profitability was
physician retention and acquisition.  This effort was spearheaded by Violi and R&V
Associates and it resulted in maintaining and increasing referrals to the hospital.

88.     Wheeling Hospital's dramatic revenue increase was accomplished by
entering into lucrative but improper compensation arrangements with physicians that were
well above fair market value, took into account the value or volume of services and/or were
not commercially reasonable, in order to gain the physicians' referrals.

89.     These agreements were formed, and payments under these agreements
continued, despite warnings from Relator that such payments were a compliance concern.

## VI.     THE FRAUD SCHEME

90.     Wheeling Hospital through R&V Associates and Violi, developed a plan for gaining monopolistic power and dominating market share in the Ohio Valley region.  This would allow them immense bargaining and contracting power with the most influential commercial insurance carriers.  The cornerstone of this plan revolved around improper physician contracts and dominating referrals.

91.     Most importantly, to effectuate their plan, Defendants strategically targeted and over-compensated certain physicians with high patient volumes—paying some over $1M a year—through employment and other agreements, in order to maintain and/or gain their referrals.

92.     Defendants knew they were overpaying those physicians.  In fact, when faced with situations where they were admittedly and significantly overpaying physicians, Defendants continued improper relationships, deciding not to "endanger" losing such valuable referral sources and patient-related revenue.

93.     Defendants withstood losses to the hospital-owned physician practices and ignored statutory and regulatory requirements in order to protect the significant amount of downstream revenue to Wheeling Hospital.

94.     Defendants, aware of the Stark Law and Anti-Kickback Statute prohibitions regarding physician compensation, knowingly over-compensated certain physicians to induce them to maintain and/or refer patients in violation of the Stark Law and/or Anti-Kickback Statute and then submitted or (caused to be submitted) those claims to federal healthcare programs in violation of the False Claims Act.

A. **Wheeling Hospital employed and overpaid many of its highest referring physicians, in violation of federal law.**

1. **Background**

95.     At the end of 2012, shortly after Relator started his employment at Wheeling Hospital, he began to see a culture where R&V Associates, and specifically Violi—with his dictatorial control of Wheeling Hospital and physician compensation—promoted the overcompensation of physicians considered most profitable to the hospital, in return for maintaining and/or increasing the physicians' referrals.

96.     In addition to negotiating and maintaining these contracts, Violi developed and monitored internal systems to measure the downstream revenue generated by physicians.

97.     Wheeling Hospital regularly tracked the referral volume and revenue generation of essentially all its employed physicians, including specific monthly and other information about the technical and professional portions of the hospital charges and profits and losses for each physician.

98.     In 2012 Relator began obtaining certain of these spreadsheets and information created and circulated by hospital management showing the amount billed for patient-related revenue/referrals of each physician, in addition to amounts related to their compensation.

99.     In November 2012, in response, in part, to questions by Relator about the physicians' productivity (also known in the industry as work Relative Value Units or "work RVUs"[1]), the Chief Operating Officer, Scott McKeets, issued a memorandum evaluating many of the practices with losses and recommending that they maintain these relationships

---

[1] The Relative Value Unit and Work Relative Value Unit was deployed by CMS as an estimation of the level of resources or value to provide a (physician) service. Unless otherwise stated, all specific RVU and MGMA (as defined in paragraph 106) references/comparisons in this Complaint are based upon Defendants' internal numbers/calculations (and Relator believes they may include physician extenders which would improperly inflate their productivity).

21

(despite excessive salaries and/or low physician productivity) in order to "protect the downstream revenue[.]"

100.    Defendants knowingly made decisions to pay compensation in excess of fair market value, explicitly taking into account the value or volume of services from referring physicians.

101.    Defendants selectively ignored losses and other factors that rendered such contracts not commercially reasonable in order to maintain and/or gain significant revenue related to patient referrals.

102.    Most of these physician contracts were negotiated and consummated between 2008-2011, prior to Relator's employment and continued throughout Relator's employment.

103.    Relator understood that Violi had arranged, or maintained, the compensation agreements and was the ultimate decision maker on these physician compensation deals.

104.    Based upon Violi's strategic plan, Defendants entered into improper employment agreements with many of its higher referring physicians as specifically set forth below.

### 2.    Obstetricians and Gynecologists ("OB/GYNs")

#### a.    Chandra Swamy, MD

105.    In 2009, Violi and Wheeling Hospital targeted Dr. Chandra Swamy, one of the highest revenue generating OB/GYNs in the region, for employment. Wheeling entered into an employment agreement with Dr. Swamy for a seven-year term.

106.    Under this contract, Wheeling Hospital paid Dr. Swamy between $1M and $1.27M per year for seven years. By comparison, the 2012 median salary (as Defendant referenced in internal documents) for an OB/GYN was $282,645 and the 90th percentile was $492,321 (as published by the Medical Group Management Association "MGMA", a source which is often referenced within the industry as a standard for the evaluation of physician compensation).

107. Dr. Swamy's compensation – more than four times that median MGMA salary and more than twice the 90th percentile of MGMA – was well above fair market value and not commercially reasonable.

108. Dr. Swamy's billings for professional services did not support her excessive salary. The hospital admitted that Dr. Swamy's salary was significantly above her productivity stating that "MGMA data shows a mean of $46.49 payment per work RVU for OB/GYN physicians. Dr. Swamy is currently in the neighborhood of $86 per work RVU."

109. Additionally, her practice typically resulted in the hospital's largest annual financial loss for Wheeling Hospital's Physician Practice Division (*e.g.,* approximately $400,000 for the fiscal year ended September 30, 2012). This loss was attributable primarily to Dr. Swamy's compensation.

110. Wheeling Hospital accepted Dr. Swamy's practice's significant losses, even though not commercially reasonable, because Defendants knew Wheeling Hospital more than made up these losses through revenue generated from Dr. Swamy's patient referrals for hospital services.

111. The internal Physician Practice Division memorandum written in November 2012 by COO Scott McKeets ("McKeets") stated that Dr. Swamy's $1.2M salary that year, and her existing employment contact terms, made it "almost impossible for this practice to show a bottom line profit."

112. However, the internal memo went on to state that "Dr. Swamy produces a huge downstream revenue to Wheeling Hospital." The memo calculated and acknowledged the exact amounts Dr. Swamy generated for Wheeling Hospital, noting that "[i]n FY 2012 hospital charges attributable to Dr. Swamy were in excess of $8.5 million resulting in payments of over $4.6 million and a contribution margin of over $2.7 million excluding overhead allocations."

113.    Ultimately, the memo concluded and recommended that Defendants should "continue to absorb the practice loss" as they "***would not want to endanger the significant downstream revenue that she produces for Wheeling Hospital.***" (emphasis added).

114.    In December 2012, another executive at Wheeling Hospital reviewed McKeets' memo and undertook his own review of certain of the hospital practices. In a communication to McKeets, this executive stated that Dr. Swamy's salary was "***way out of market***": Wheeling Hospital "***might be able to justify $700,000 +/- salary***, but at $1.2M this contract will never be even close to break even." The executive concluded that the "***physician contract is a problem***" (emphasis added).

115.    Despite being fully aware that Dr. Swamy's salary was well above fair market value, Wheeling Hospital and Violi took no remedial action, and continued to pay Dr. Swamy under the contract.  It is believed the contract still remains in place.

                    b.    Jessica Morano, MD

116.    In 2008, Wheeling Hospital entered into an employment agreement with another OB/GYN, Dr. Jessica Morano, for a five-year term, which included a base salary of $650,000, plus 80% of the practice net income.

117.    Dr. Morano's employment agreement resulted in compensation that was also above fair market value and not commercially reasonable.

118.    In 2012, for example, Dr. Morano was paid approximately $674,000.  Dr. Morano's compensation was more than twice the median MGMA salary referenced by Defendant for an OB/GYN ($282,645) and well in excess of the 90th percentile of MGMA ($492,321).

119.    Dr. Morano's salary was also not supported by her practice productivity or billing.  Similar to Dr. Swamy, the hospital acknowledged that Dr. Morano was paid more than her productivity warranted—$78 per work RVU when the MGMA mean was $46.49.

120.    Moreover, her practice also resulted in annual financial losses to Wheeling Hospital's Physician Practice Division. For example, for the fiscal year ended September 30, 2012, Dr. Morano's practice lost approximately $213,000.

121.    In the 2012 Physician Practice Division memo discussed above, Wheeling Hospital similarly justified Dr. Morano's salary in terms of revenue gained from referrals: "[i]n 2012 Dr. Morano produced approximately $6.5 million in hospital downstream gross charges resulting in approximately $3.4 million in payments and a contribution margin of slightly over $2.0 million excluding overhead."

122.    The memo concluded that at the end of the contract term, Wheeling Hospital should renegotiate Dr. Morano's contract to be based on net profit, noting that Dr. Morano "*does bring a significant amount of revenue to the hospital which we need to protect, especially given her non-compete is somewhat watered down so we would need to approach this delicately with her*" (emphasis added).

123.    Wheeling Hospital, with Violi's knowledge and direction, continued to pay Dr. Morano under the contract through fiscal year 2014.


3.    **Radiation Oncologists**

124.    In 2011 Wheeling Hospital entered into employment contracts with two radiation oncologists, Dr. Gregory Merrick and Dr. JonDavid Pollack, for ten-year terms.

125.    These two physicians practiced at the Wheeling Hospital Schiffler Cancer Center, which was managed by Violi and Wheeling Hospital CFO, Jim Murdy.

126.    These contracts provided for base compensation of $1,140.000 and $1,050,000, respectively, and a "bonus to be determined by the CEO". These two physicians were the only employed physicians whose contract called for a bonus that was to be determined by the CEO.

127.    The contracts resulted in annual compensation, from 2011 through the present, of approximately $1.2M-$1.3M for Dr. Merrick, and $1.1M-$1.2M for Dr. Pollack.

128.    This compensation was well above fair market value and not commercially reasonable.   For example, in 2016, Dr. Merrick and Dr. Pollack's compensation was more than twice the median national[2] MGMA salary ($500,000) and well in excess of the 90th percentile ($781,545).

129.    In joining Wheeling Hospital, Dr. Merrick explicitly required that his negotiations and employment be managed exclusively by Violi. As a result, information about their employment and productivity was typically shielded from Relator and other Wheeling Hospital executives.

130.    Dr. Merrick and Dr. Pollack's productivity and revenue generation statistics, while known to be high, were not typically discussed or included in many of the spreadsheets tracking data of other employed physicians.

131.    However, two of the spreadsheets that did include the radiation oncologists reflected that Drs. Merrick and Pollack's referrals significantly increased upon their employment in 2011.   For example, one document showed that Wheeling Hospital generated gross facility charges of approximately $17M before they were employed, but after employment, this revenue increased to $26M and continued near that level throughout their employment.

132.    Defendants were aware that they were over compensating Dr. Merrick and Dr. Pollack.

133.    Wheeling Hospital continues to pay Drs. Merrick and Pollack under their contracts.

---

[2] The MGMA numbers are even lower for the Eastern region of the United States where Wheeling Hospital is located.

4.   **Cardiology**

134.   Cardiovascular surgery was, and is, an extremely important revenue generator for Wheeling Hospital.  Prior to 2009, the cardiovascular surgery practice of Drs. Rajai Koury and Ahmad Rhabar was the largest cardiovascular physician practice in the Wheeling market area. Both practiced extensively, but not exclusively, at Wheeling Hospital.  After a dispute between the physician partners, Drs. Koury and Rhabar dissolved their partnership and Dr. Koury began to reduce his practice at Wheeling Hospital and formed a new cardiovascular surgery group that practiced within the broader market area.

135.   In an effort to preserve the cardiovascular referrals, Violi entered into a lucrative five-year employment contract with Dr. Rahbar, allowed him to hire two additional cardiologists (more junior practitioners) for his team, and arranged for the hospital to rent physician office space owned by Dr. Rhabar.  This new three-physician cardiology practice was named the Wheeling Heart Institute.

136.   Dr. Rahbar's contract provided for a base salary of $513,000 plus 28% of the Wheeling Heart Institute practice Net Income or 35.4167% of Net Revenue if greater than $1.5M.  This resulted in compensation for Dr. Rahbar of between approximately $500,000-$780,000 a year.

137.   This compensation was above fair market value and not commercially reasonable.

138.   In 2012, for example, Dr. Rahbar was paid approximately $770,000. Dr. Rahbar's salary was almost twice the salaries of the other two cardiologists in the practice, despite the fact that Dr. Rahbar did not work for approximately 25% of the year.  Dr. Rahbar didn't see patients full time as he had a generous paid-time-off arrangement (twelve weeks off), and a favorable Continuing Medical Education arrangement which had him traveling to (resort) locations of his choice for approximately four more weeks per year.

27

139.    Dr. Rahbar was paid $120 per work RVU which, according to MGMA  and Defendants' internal documents, was almost twice the mean work RVU of $62, and almost four times the payment per RVU paid to the other two cardiologists.

140.    In fiscal year 2012, the cardiology practice experienced a loss of $240,000. Prior years practice losses were at similar levels.  Wheeling Hospital, however, absorbed these losses to maintain the lucrative cardiology referrals, as well as the patient volume required to maintain a viable invasive cardiology service offering.

141.    The November 2012 internal PPD memo discussed above made clear the importance of revenue gained from cardiac referrals: Dr. Rahbar generated "over $23,000,000 in downstream gross charges to Wheeling Hospital in FY 2012 resulting in payments to the hospital of approximately $9.8 million and a contribution margin of over $2.5 million excluding overhead allocations."

142.    The memo concluded that the practice could benefit by increasing the productivity of Dr. Rahbar given his "***generous payment provisions***; however, that may be difficult to do given the fact that his contract provides for 12 weeks of vacation per year." (emphasis added).   The memo concluded Wheeling should attempt to recruit another surgeon at more favorable contract terms to replace Dr. Rahbar if he decided to retire or re-negotiate more favorable terms on a renewal of his agreement.  The memo also suggested that Wheeling Hospital management should discuss referral patterns with physicians to influence shifting of referrals.

143.    Wheeling Hospital continued to pay Dr. Rahbar under the contract through 2014.

28

**B.      Defendants Overcompensated a Contracted Pain Management Physician in Violation of Federal Law**

144.    In addition to overpaying employed physicians, Wheeling Hospital entered into an improper independent contractor agreement with a pain management physician to induce his referrals.

145.    In June 2012, Wheeling Hospital was introduced to Dr. Adam Tune, a board-certified physician in pain management and anesthesia, by two Wheeling Hospital anesthesiologists, who wanted Dr. Tune to practice at Wheeling Hospital.

146.    Dr. Tune was looking for an opportunity to establish a pain management practice at Wheeling Hospital.  Wheeling Hospital management knew there was a significant pain management market and wanted to capitalize on it.

147.    Subsequent to the introduction to Dr. Tune, Violi asked Relator to discuss employment with Dr. Tune.  During these discussions, Dr. Tune suggested that he was less interested in an "employment" agreement and more interested in some other type of "private" model.  Dr. Tune also inquired about a "directorship", as well as a possible "physician/hospital joint venture" type agreement.

148.    Relator, however, believed that an employment agreement was the proper way to proceed and Wheeling Hospital presented a draft employment contract to Dr. Tune. This contract provided for a base salary of $450,000 plus an incentive which included a percentage of the net income attributable to Dr. Tune's professional services—a typical and appropriate type of offering for an employment contract.  Based upon Relator's calculations, he believed that amount of incentive compensation that Dr. Tune would be able to earn based upon professional services would be minimal.

149.    Dr. Tune was persistent that he did not want the typical employment agreement but instead was seeking an arrangement with annual compensation under an "alternative/undefined model" that would compensate him at approximately $1M per year.

Relator believed that this would only be possible if he was to receive a portion of Wheeling Hospital's technical component for patient services, which would violate federal law.

150.    Given Dr. Tune's stated compensation demands and Relator's refusal to further negotiate the compensation parameters of the deal — he believed Dr. Tune's expectation was improper — the discussions between Dr. Tune and Relator stalled in the fall of 2012.

151.    Shortly thereafter, in November 2012, one of the Wheeling Hospital anesthesiologists who originally introduced Dr. Tune to Wheeling Hospital wrote a scathing text message to Relator. In this message, the anesthesiologist expressed his dissatisfaction that a deal was not reached, stating that Relator "could not treat people like this."

152.    In December of 2012, Relator was asked by a representative of West Virginia University ("WVU") the status of Dr. Tune's potential employment because WVU wanted another one of its pain management physicians to be on the medical staff at Wheeling Hospital.  Relator explained that there was no deal yet and that Dr. Tune had to come to grips with the economic realities of his chosen profession, something he was having difficulties doing.   Relator also speculated that Dr. Tune might open his own private practice.

153.    Without Relator's knowledge, however, discussions had continued between Dr. Tune and Wheeling Hospital, through Violi. Wheeling Hospital agreed to an Independent Contractor arrangement with Dr. Tune.  This agreement was consummated on August 19, 2013 and provided for compensation of $3,000 a day (more than $600,000 annually) plus 70% of the practice's net income.

154.    In the definitions provided in the contract, the practice revenue that Dr. Tune was entitled to share in, included "all professional *and technical revenue* generated by Independent Contractor regardless of where the services [are] performed" (emphasis added). This definition was different than the typical contract language used by Wheeling Hospital, and different than that which was presented to Dr. Tune in the original offered employment

contract.  This made Dr. Tune's compensation vary directly with the volume and value of his referrals.

155.    The new independent contractor arrangement resulted in compensation well in excess of $1M each year; Dr. Tune earned approximately $1.5M in 2015 and 2016.

156.    This compensation was in excess of fair market value, took into account the value or volume of services and other business generated, and was not commercially reasonable.

157.    Defendants entered into this agreement because of the referral revenue generated by Dr. Tune for the hospital.

## C.    **Other Improper Compensation**

158.    Upon information and belief, Wheeling Hospital also entered into employment agreements with other physicians, including additional OB/GYNs and certain pediatricians, that were above fair market value and/or were not commercially reasonable in violation of federal law.

159.    For example, another OB/GYN, Dr. Coleman, was paid annually between approximately $500,000 and $700,000, which is greater than the 90th percentile of MGMA as cited by Defendants' internal documents.

160.    Dr. Coleman's work did not support being compensated above the 90th percentile, as she and another physician typically worked only 4 days a week.   Additionally, her practice resulted in losses of over $100,000 for 2012.

161.    On one occasion, Relator was informed by Violi that Violi had communicated to Dr. Coleman that Relator "would not pay her what he is paying her."

162.    Furthermore, Wheeling Hospital improperly paid several of its pediatricians more than the 90th percentile of MGMA, which was in excess of fair market value and not commercially reasonable.

163.     Defendants tracked information about each physician and knew the amount that each had generated in downstream revenue.  Defendants knew this downstream revenue from referrals would make up for excessive salaries and losses and knowingly overpaid these physicians in violation of federal law in order to maintain and/or gain their lucrative referrals.

164.     Additionally, upon information and belief, Wheeling Hospital entered into a lease arrangement that funneled money to radiologists who practiced at Wheeling Hospital. Rather than leasing an MRI machine directly, the hospital leased one from an entity owned in-part by radiologists that were contracted to Wheeling Hospital.

165.     By using this entity as a middle-man, the hospital significantly overpaid for its MRI machine, allowing the radiologists to benefit from the arrangement in violation of federal laws.

**D.      Defendants orchestrated this scheme, knew they were overcompensating physicians for their referrals, and knew that such compensation violated the law.**

166.     As described above, Wheeling's tactical plan, as directed by Violi, was to provide above fair market value remuneration to specific physicians who would refer, continue to refer patients and the related revenue to the hospital in order to improve its financial results, market share, revenue and bottom line income.

167.     This became obvious to Relator in late 2012 when Relator became aware that certain physicians' compensation was excessive and then later with the hospital's arrangement with Dr. Tune.

168.     In the fall of 2012, Relator obtained a "Physician Impact Report" from McKeets, which laid out specific details about the monetary outcomes between the employed physicians and the hospital.  This impact report essentially summarized the physician practices financial outcomes and hospital (contribution) margins generated by the physician practice.

169.    Subsequently, in November of 2012, McKeets issued the internal PPD memorandum (discussed above) evaluating many of the practices with financial losses, acknowledging that the hospital sustains these losses in order to "protect the downstream revenue".  Once the Relator saw this information, the Relator asked McKeets for additional analysis.  McKeets responded with communications and spreadsheets about the RVU productivity of these physicians and the hospital's charges for these physicians.

170.    After obtaining this internal memo Relator was concerned for the hospital and sought to discuss the risks with Violi.  During the initial conversation between Relator and Violi regarding this topic, Relator told Violi that certain compensation arrangements were concerning, and specifically inquired about the details of Dr. Swamy's compensation arrangement, which Relator viewed as most egregious. Violi responded that Dr. Swamy's compensation was equivalent to what she previously made in private practice and was therefore not a risk, nor an issue for further discussion.

171.    Over the remaining term of Relator's business arrangement with the hospital, Relator had other discussions with Violi where Relator broached the risks associated with improprieties related to physician compensation arrangements.

172.    In another conversation, Relator cautioned Violi that he may be exposing himself to the risk of lengthy litigation (by overpaying physicians).   Violi came back (a week or so) later and said that he discussed the concerns with Vince (referring to his partner Vince Deluzio), who responded that Relator should stay out of these (nonfinancial) issues, commenting that "it's a good thing he is not an attorney, because he would starve and should stick to financial matters."

173.    During yet another conversation, Relator shared with Violi the concern that Wheeling Hospital may be relying on an outside attorney to review and evaluate physician employment contracts who did not have the experience to do such a review. Relator

suggested that Violi should consider retaining a larger firm with more healthcare expertise. Violi ignored this suggestion.

174.    As set forth above, on multiple occasions, Relator advised Violi of the concerns related to the agreements described herein. In addition, Relator believes that Violi was well aware of the risks and liability to which the arrangements exposed defendants.

175.    On November 27, 2012, in the midst of these discussions with Violi, the CFO Jim Murdy sent an email forwarding an article about a hospital accused of overpaying doctors and settling with the Department of Justice to the hospital's Chief Operating Officer and Executive Vice President.  It was also well known that Wheeling's rival hospital and primary market competitor had settled with the Department of Justice for overcompensating a physician.

176.    Wheeling Hospital and Violi had full knowledge that overcompensating physicians could be a violation of the Stark Law, the Anti-Kickback Statute and the False Claims Act.   In fact, Violi was aware of Stark and Kickback regulatory issues as far back as 2006 when he used the regulations as a reason for raising physician office rental charges within the hospital medical office complex.

177.    When it was clear to the Relator that Violi was unwilling to address Relator's concerns relating to physician compensation, Relator ceased further communications with Violi on the matter. In addition, Violi seemed to distance himself from Relator regarding physician issues.

178.    Relator continued to work at Wheeling Hospital, with less exposure to physician compensation issues and corresponding discussions with Violi on the matter, as dictated by Violi.

179.    Relator was approached by board member Nick Sparchane about Violi in or around early August 2015.  During that conversation Mr. Sparchane asked Relator if he thought the financial success of the hospital might be partially attributable to violations of

34

any regulatory matters.  Relator responded yes; Mr. Sparchane said he was not surprised and thought that might be the case.

180.    Shortly thereafter, in late August 2015, Relator was terminated.  As a reason for termination, he was told by Violi that they (the physicians) "wouldn't work for you," implying that Relator wouldn't strike the deals that were required by these physicians—deals that Violi believed were necessary to make the hospital profitable.

E.    **These compensation arrangements violated the Stark Law and/or the Anti-Kickback Statute and the submission of claims for those referrals violated the False Claims Act.**

181.    Defendants initiated and maintained compensation and other arrangements lucrative to the Hospital's maintaining and obtaining referrals.

182.    These arrangements were not fair market value or commercially reasonable in violation of federal law.

183.    One purpose of the physician compensation/remuneration was to obtain referrals or to induce further referrals.

184.    Defendants have knowledge that agreements violate Stark and/or the AKS and that the submission of claims for those referrals could violate the False Claims Act.

185.    Defendants could not have reasonably concluded that these contracts and the compensation paid did not violate federal law or that statutory or regulatory exceptions or safe harbors applied under these circumstances.

186.    Each claim submitted in violation of the Stark Law and/or the AKS is a false claim within the meaning of the False Claims Act.  Thus, through their illegal conduct, Defendants have submitted thousands of false or fraudulent claims to Medicare, Medicaid and other government health care programs, and failed to return overpayments based upon those tainted and improperly submitted claims.

35

## Count I
## False Claims Act
## 31 U.S.C. §§ 3729(a)(1)(A)(B) & (G)

187.    Relator realleges and incorporate by reference the allegations contained in paragraphs 1 through 186 above as though fully set forth herein.

188.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

189.    By and through the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

190.    By and through the acts described above, Defendants knowingly made, used or caused to be made or used, false statements or records material to false or fraudulent claims.

191.    By and through the acts described above, within the meaning of the False Claims Act, Defendants knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

192.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

193.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

194.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein occurring prior to November 2, 2015, and $21,563 for each violation occurring after.

36

## VII.   PRAYER

WHEREFORE, *qui tam* Relator prays for judgment against the Defendants as follows:

1.   That Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.;

2.   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 occurring prior to November 2, 2015, and not less than $10,781 and not more than $21,563 for each violation of 31 U.S.C. § 3729 occurring after November 2, 2015.

3.   That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act and any relevant state statutes.

4.   That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5.   That Relator recover such other relief as the Court deems just and proper.


## VIII.   DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, *qui tam* Relator Louis Longo hereby demands a trial by jury.


Dated:  December 22, 2017

Respectfully submitted,


/s/ Amy L. Easton
Amy L. Easton
PHILLIPS & COHEN LLP
2000 Massachusetts Ave NW
Washington D.C. 20036

Tel:  (202) 833-4567
aeaston@phillipsandcohen.com

Jeffrey W. Dickstein
PHILLIPS & COHEN LLP
Southeast Financial Center
200 S. Biscayne Blvd., Suite 2790
Miami, Florida 33131
Tel: (305) 372-5200
jdickstein@phillipsandcohen.com


/s/ Andrew M. Stone
Andrew M. Stone (Pa. No. 35176)
STONE LAW FIRM LLC
437 Grant Street
Suite 1806
Pittsburgh, PA 15219
Tel: (412) 391-2005
astone@stone-law.com

Attorneys for *Qui Tam* Plaintiff Louis Longo